UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ANTHONY CUSAMANO,                         :
                                          :            PRO SE
                  Petitioner,             :
                                          : 06 Civ. 6047 (PAC)(THK)
          -against-                       :
                                          :
JOHN J. DONELLI,                          :           **REPORT**
                                          :      **AND RECOMMENDATION**
                  Respondent.             :
------------------------------------X

**FROM: THEODORE H. KATZ, United States Magistrate Judge.**
**TO: HON. PAUL A. CROTTY, United States District Judge.**

This habeas corpus proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York.

Petitioner Anthony Cusamano was convicted after a jury trial in the New York State Supreme Court, New York County, of Burglary in the Third Degree (New York Penal Law ("PL") § 140.20), Robbery in the Third Degree (PL § 160.05), Criminal Possession of Stolen Property in the Fifth Degree (PL § 165.40), and Possession of Burglar's Tools (PL § 140.35). He was sentenced, as a second felony offender, to an aggregate indeterminate term of three and one-half to seven years' imprisonment and is currently incarcerated in the Ulster Correctional Facility located in Napanoch, New York.

Petitioner seeks a writ of habeas corpus under 28 U.S.C. §

1

2254, claiming: (1) his burglary prosecution was untimely; (2) the pretrial hearing judge improperly denied his motions to dismiss the felony complaint; (3) the felony complaint was defective; (4) the trial court performed an inadequate pro se inquiry prior to commencement of trial; (5) the trial court improperly limited his cross-examination; (6) there was prosecutorial misconduct by: (a) suborning perjurious testimony before the grand jury, and (b) intentional misrepresentation of trial testimony on summation; (7) the prosecutor illegally amended the indictment; (8) judicial bias by the pretrial judge; (9) judicial bias by the trial judge; (10) improper denial of basic forms of discovery; (11) ineffectiveness of arraignment counsel; and (12) the "multitudinous errors" by the courts and prosecutor, not subject to harmless error review, violated his right to a fair trial. (See Petitioner's Statement of Facts ("Pet. St."), at 1-54; Petitioner's Memorandum of Law ("Pet. Mem.") at 1-56; Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Jan. 31, 2007 ("Resp't Mem."), at 9-10.)  Respondent has moved to dismiss the Petition, arguing that Petitioner's claims lack merit.

For the reasons that follow, this Court concludes that Petitioner is not entitled to habeas corpus relief and recommends that the Petition be dismissed with prejudice.

**BACKGROUND**

I. <u>Pre-Trial Proceedings</u>

Lawrence Linzer of the Legal Aid Society was Petitioner's initial attorney at his arraignment. (Pre-Trial Transcript, dated July 18, 2003 ("PT Tr. July"), at 2.) Although there is a factual dispute as to what occurred, Petitioner alleges that he had advised Linzer that he wished to testify before the grand jury, and, according to Petitioner, Linzer did not make a request to the court that Petitioner be permitted to do so. (<u>See</u> <u>id.</u> at 2-3.) As a result, Petitioner requested that new counsel be appointed to represent him. Linzer was relieved as counsel and, another attorney, Ms. Seema Iyer, was assigned to represent Petitioner. (<u>See</u> <u>id.</u> at 3; Pre-Trial Transcript dated Aug. 12, 2003 ("PT Tr. Aug. 12"), at 2-3.)

During a pre-trial hearing, Petitioner expressed his intention to proceed at trial <u>pro</u> <u>se</u>. (Pre-Trial Transcript, dated Aug. 14, 2003 ("PT Tr. Aug. 14"), at 2.) After conducting a searching inquiry to determine that Petitioner's waiver of the right to counsel was given knowingly, competently, and intelligently, the court granted Petitioner's motion to proceed <u>pro</u> <u>se</u>, with Ms. Iyer to remain as his legal advisor. (<u>See</u> <u>id.</u> at 4-9.)

II. <u>The Trial</u>

The People adduced the following evidence at trial.[1] On February 24, 1998, Petitioner, a male, entered the Eddie Bauer store at 1172 Third Avenue in Manhattan, removed five shirts from a rack, and brought them into the women's fitting room. (See Trial Transcript, dated Nov. 5, 2003 ("Tr. B")[2], at 19-24.) Eddie Bauer loss prevention manager Fatah Bensalem ("Bensalem") followed Petitioner into the fitting area because he looked "nervous" and "in a hurry," and had not looked at the price tags before picking up the shirts. (See id. at 13-15, 19-21.) Bensalem testified that he watched Petitioner, prior to entering the fitting room, place aluminium foil over the "sensormatic" tags that were attached to the shirts as a security measure.[3] (See id. at 18-20, 112-13.) When Petitioner opened the door to the fitting room to exit, Bensalem believed that there were clothes hidden inside of Petitioner's

---

[1] These facts are drawn largely from the trial testimony of Fatah Bensalem ("Bensalem"), the plainclothes loss prevention manager at Eddie Bauer, who was the People's chief witness at trial.

[2] The trial Transcript submitted by the Attorney General's Office consists of one volume containing four separately paginated sections. The first section is labeled "voir dire" and is dated Oct. 30, 2003. The next two sections are labeled "Jury Trial" and are dated Nov. 5, 2003; the first section will be referred to as "Tr. A" and the second will be referred to as "Tr. B". The final section is labeled "Jury Trial" and is dated Nov. 7, 2003, and will be referred to as "Tr. C".

[3] Putting aluminum foil on security tags effectively "block[s] the signal" and inhibits the tag from triggering the alarm when leaving the store. (See Tr. B at 20.)

jacket because he looked "pregnant." (See id. at 20-21.) Petitioner

then walked toward the exit without paying for the merchandise.

(See id. at 21.) At that point, Bensalem stopped Petitioner,

escorted him to the security office, and recovered the five shirts

that he had hidden in his jacket. (See id. at 22-24.) Bensalem also

photographed Petitioner and prepared a voluntary trespass notice,

which stated:

> I, [Petitioner], . . . do hereby make the following
> statement on a voluntary [basis] and understand[] that
> this statement could be used in a court of law. I further
> understand that I am making this statement to Fatah
> Bensalem, who [has identified himself as a loss
> prevention associate] for Eddie Bauer.
>
> [On] February 24, 1998, I was told never to return to
> Eddie Bauer because of my uncivilized behavior[,] which
> includes shoplifting merchandise[, the total of which
> amounted to] $198.00.
>
> I have been released on [the] condition that I never
> return to this or any Eddie Bauer store. If I do, the
> result may be [prosecution] for trespassing as well as
> this offense. I have read [this] statement . . . and to
> [the best of my] knowledge[,] state that this statement
> is true and correct.

(See id. at 24, 28.) Bensalem read this notice to Petitioner and

informed him that, in exchange for releasing him, if he ever

returned to an Eddie Bauer store in the future he could face

criminal prosecution. (See id. at 28-30.) Petitioner signed the

notice with the alias "Anthony Ferrante," filled in his address,

his photograph was attached, and he was then released. (See id. at

28-31, 34-35.)

Over five years later, on July 15, 2003, at about 11:10 a.m., Petitioner returned to the same Eddie Bauer location with two large paper bags, picked up approximately ten shirts without looking at the price tags, and walked into the handicapped men's fitting room. (See id. at 37-39, 78.) Each fitting room had a wooden door with a gap of approximately two feet between the bottom of the door and the floor. (See id. at 223-24.) Bensalem, who was still employed by the store as a plainclothes security guard, recognized Petitioner from the prior incident and followed him into the fitting room area once again. (See id. at 36-37, 43, 47.) Bensalem positioned himself in a fitting room across from the one in which Petitioner stood, approximately three to four feet away, and bent over, at which point he was able to observe Petitioner from the waist down. (See id. at 43-44, 94-95.)

Petitioner then "pulled a screwdriver from his right pants pocket" and used it to remove the "sensormatic" security tags from the ten shirts that he had taken into the fitting room. (Id. at 44-45.) Bensalem testified that he heard the security tags being removed and then dropped to the floor, as Petitioner did not collect them until they were all removed. (See id. at 44-45.) While still in the fitting room, Petitioner placed the shirts into one of the paper bags that he brought with him into the store, and placed

6

the "sensormatic" security tags into a small, black plastic bag. (See id. at 45-46.) Petitioner then went to the back of the store, not knowing he was being followed by Bensalem, hid the plastic bag with the "sensormatic" tags in between a pile of clothing, selected additional merchandise, and went back to the fitting room briefly. (See id. at 46-47.) He then walked toward the exit without attempting to pay for the shirts that he had placed in his paper bag. (See id. at 47-48.) When Bensalem called out Petitioner's name, Petitioner ran out of the store with the merchandise. (See id. at 48-49.) Bensalem pursued him and caught him soon after. (See id. at 49.) Petitioner then tried to push Bensalem away with both hands, and continued to do so while Bensalem brought him back to the store. (See id. at 49-51.) Petitioner only stopped pushing Bensalem when they entered the vestibule of the store, after which Bensalem took Petitioner to the security guard's office. (See id. at 51-52.)

Bensalem recovered ten Eddie Bauer shirts, valued at $469.50, from the paper bag that Petitioner was carrying, as well as the plastic bag with the "sensormatic" security tags that Petitioner had attempted to hide at the back of the store. (See id. at 53-54, 57.) Bensalem also recovered a snake-claw screwdriver from Petitioner's pants pocket, and a set of pliers from one of his paper bags – tools that, in the security guard's experience, were

often used to break "sensormatic" security tags. (See id. at at 54-55, 74-77.[4]) Bensalem took Petitioner's photograph again, had him complete another trespass affidavit, which was signed "Anthony Cusamano". Bensalem then contacted the police. (See id. at 57-58, 65-67.)

At about 11:52 a.m., Police Officer Sam Gilmont and his partner, Officer Cavanagh, went to the Eddie Bauer store where Petitioner was being held. (See id. at 67, 145-146.) Bensalem testified that he informed the officers of the 1998 incident, that Petitioner had just attempted to take ten shirts without paying for them, and that Petitioner ran and "tried to escape."[5] (Id. at 67, 108, 162.) Bensalem handed Officer Gilmont the 1998 trespass affidavit, a receipt listing the value of the ten shirts, the "sensormatic" security tags, and the two tools he had recovered from Petitioner. (See id. at 67, 69-70, 74-75, 147-48, 150 152-53,

---

[4] A Loss Prevention Incident Report ("L.P.I.R.") prepared by Bensalem for his "own record" and not given to the police, which was used only to refresh his recollection during his direct testimony, stated that he had recovered twelve shirts and twelve "sensormatic" security tags from Petitioner. (Tr. B at 56, 97-100, 106-07). Bensalem could not recall when he had prepared the report, but estimated that he prepared such reports "[s]ometimes days later" or "[s]ometimes [] months later." (Id. at 97-98, 105-06.)
[5] On cross-examination, Officer Gilmont did not recall Bensalem mentioning that Petitioner fought or used any force in attempting to escape. He testified that Bensalem "just said he stopped [Petitioner] outside the store." (Id. at 176.)

166-67.) Officer Gilmont then searched Petitioner's other paper bag and recovered a red screwdriver. (See id. at 68, 74-75, 77, 79, 149, 152, 168, 178.) Gilmont then arrested Petitioner and took him to the police station. (See id. at 145-46, 154, 173.)

At about 12:25 p.m., while booking Petitioner at the police station, Sergeant Sam Eskenazi asked Officer Gilmont why Petitioner was being charged with burglary, and Gilmont responded that he had signed a trespass notice after a previous incident.[6] (See id. at 182, 185.) In a nearby cell, Petitioner yelled out that "it was a shoplift, not a burglary." (Id. at 182.)

On November 7, 2003, the jury found Petitioner guilty of third-degree burglary, third-degree robbery, fifth-degree criminal possession of stolen property, and possession of burglar's tools. (Trial Transcript, dated Nov. 7 ("Tr. C"), at 22-23.)

V.   Post-Trial Proceedings

On March 10, 2004, Petitioner was sentenced, as a second felony offender, to concurrent indeterminate terms of three and one-half  to seven years' imprisonment on the third-degree burglary and robbery convictions, with those sentences to run concurrent to

---

[6] The basis for the charge of burglary in the third degree was that since Petitioner signed a trespass notice in 1998, in which he acknowledged that his right to enter that Eddie Bauer location had been revoked, he subsequently entered the store unlawfully.

his determinate one-year prison terms for the fifth-degree criminal possession of stolen property and possession of burglar's tools misdemeanor convictions. (See Sentencing Transcript, dated Mar. 10, 2004, at 3-4, 10.)

Proceeding pro se on appeal, Petitioner filed a brief in the Appellate Division, First Department, on March 9, 2005, raising the same twelve claims as those in the Petition in this proceeding. The Appellate Division unanimously affirmed Petitioner's convictions, finding that: (1) the burglary prosecution was not untimely, as the trespass notice "had no expiration date and was lawful since it had a legitimate basis and did not inhibit or circumscribe defendant from engaging in constitutionally or statutorily protected conduct"; (2) the trial judge properly conducted the requisite inquiry for Petitioner's proceeding pro se, and "[i]n light of the adequate pro se inquiry during pretrial proceedings, defendant's extensive familiarity with the criminal justice system and his prior experience representing himself, it is clear that defendant knowingly, competently and voluntarily waived his right to counsel, and further detailed inquiry by the trial court was not required"; (3) "[t]he challenged comments of the trial assistant during summation . . . did not constitute prosecutorial misconduct warranting reversal," as their effect, "if any, could not have been so substantial as to deny defendant his due process right to a fair

trial"; (4) "[t]here [was] no support for [the] contention that the prosecutor suborned perjury"; and (5) without addressing them individually, found defendant's remaining contentions "unavailing." People v. Cusamano, 22 A.D.3d 427, 805 N.Y.S.2d 1 (1st Dep't 2005).

Petitioner sought leave to appeal the Appellate Division's decision to the New York Court of Appeals. In a certificate dated January 6, 2006, the Court of Appeals denied Petitioner's leave application. See People v. Cusamano, 6 N.Y.3d 775, 811 N.Y.S.2d 342 (2006). Petitioner then filed the instant habeas Petition pro se, raising the same claims he had raised on direct appeal.[7]

## DISCUSSION

I. Standard of Review Under AEDPA

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §

---

[7] There is no dispute that the Petition is timely and that Petitioner has exhausted all of his claims.

2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v. Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001). The phrase, "clearly established Federal law," limits the law governing a habeas petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, -- U.S. --, 127 S. Ct. 649, 653 (2006) (citing Williams, 529 U.S. at 412, 120 S. Ct. at 1523); accord Leslie, 230 F.3d at 32.

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The inquiry for a federal habeas court is not whether the state court's application of the governing law was incorrect, but rather whether it was "objectively unreasonable."

12

See id. at 409-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); Lurie v. Wittner, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003). "A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

II. The Timeliness of the Prosecution

Petitioner argues that his prosecution for burglary on the

13

basis of the five-and-a-half year-old trespass agreement was untimely, and thus violated his due process rights. (See Pet. St., at 18-19; Pet. Mem., at 30-31.) The Appellate Division rejected this claim, concluding that the trespass notice "had no expiration date and was lawful since it had a legitimate basis and did not inhibit or circumscribe defendant from engaging in constitutionally or statutorily protected conduct." Cusamano, 22 A.D.3d at 427, 805 N.Y.S.2d at 1.

Petitioner relies on New York Criminal Procedure Law ("CPL") § 30.10(2)(b) as the basis for this claim, (see Pet. St., at 18-19; Pet. Mem., at 30-31), which provides that a prosecution for any felony, other than those classified as Class A, "must be commenced within 5 years after the commission thereof." N.Y. Crim. Proc. L. § 30.10(2)(b) (McKinney 2007).

Statutes of limitation are "designed to protect individuals from having to defend themselves against charges when the basic facts have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." Toussie v. United States, 397 U.S. 112, 114, 90 S. Ct. 858, 860 (1970). However, statutes of limitation do not fully define a defendant's rights with respect to the events occurring prior to indictment. See United States v. Marion, 404 U.S. 307, 234, 92 S. Ct. 455, 465 (1971). Pre-indictment delay may result in

14

a violation of due process, but "only when there is a showing of actual prejudice to the defendant's right to a fair trial and unjustifiable Government conduct." United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir. 1979) (citing United States v. Lovasco, 431 U.S. 783, 789-90, 97 S. Ct. 2044 (1977) and Marion, 404 U.S. at 234-25, 92 S. Ct. 455)); accord United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003) (rejecting a due process pre-indictment delay claim, because there was no evidence of intentional delay.) "If the indictment is brought within the applicable statute of limitations, there is a presumption that the defendant was not prejudiced." Georgison v. Donnelli, No. 04 Civ. 1444 (DC), 2005 WL 1384015, at *7 (S.D.N.Y. June 9, 2005).

Petitioner's reliance on CPL § 30.10(2)(b)'s statute of limitations is misplaced, as it does not apply to his burglary conviction.[8] Petitioner was not indicted for the 1998 incident that resulted in the signing of the trespass notice. Instead, the notice was relied upon to establish that when he entered the store on July 15, 2003, he did so unlawfully. See People v. Polite, 302 A.D.2d 227, 227, 753 N.Y.S.2d 722, 722 (1st Dep't 2003) (holding that even

---

[8] Petitioner also attempts to invoke the limitation period of § 214 of New York's Civil Practice Law & Rules (actions for penalties created by statute must be commenced within three years). As this provision applies only to civil practice, Petitioner's reliance is misplaced.

where defendant refused to sign a trespass notice that was read to him, it clearly and unequivocally informed him that he was prohibited from entering the premises again). The burglary for which Petitioner was arrested and tried occurred in 2003, and Petitioner was so-charged shortly thereafter in accordance with CPL § 20.10(2)(b).

Accordingly, the indictment was brought within the applicable statute of limitations; moreover, Petitioner has failed to demonstrate that his ability to defend himself at trial was prejudiced in any way because of delay. Therefore, the state court's conclusion that Petitioner's due process rights were not violated by an untimely prosecution was not contrary to, or an unreasonable application of, clearly established Federal law. The Court thus recommends that this claim be dismissed.

III. The Denial of Petitioner's Motions to Dismiss

Petitioner argues that the pretrial hearing court erroneously denied two motions he submitted seeking dismissal of the felony counts, as it was mandatory for the court to grant them pursuant to New York law. (Pet. St., at 20-22; Pet. Mem., at 33-34.) The Appellate Division summarily rejected these claims as "unavailing". Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d at 1.

The first motion submitted by Petitioner alleged that he was indicted in violation of CPL § 190.50(5), as the charge of robbery

in the third degree was presented to the grand jury without it being previously presented to either the court or to Petitioner. Section 190.50(5)(a) provides that where a defendant has been arraigned upon a felony complaint charging an offense which is the subject of a grand jury proceeding, "the district attorney must notify the defendant or his attorney of the prospective or pending grand jury proceeding and accord the defendant a reasonable time to exercise his right to appear as a witness therein." CPL § 190.50(5).

As an initial matter, violations of state procedural rules do not, of themselves, give rise to constitutional claims cognizable in a habeas proceeding. "It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002) (citing 28 U.S.C. § 2254, and Estelle v. McGuire, 502 U.S. 62, 67-68 112 S. Ct. 475 (1991)). In any event, it is clear that the Appellate Division properly concluded that there was no violation of New York law. The robbery charge about which Petitioner now claims he received inadequate notice was not included in the felony complaint and, "thus, by statute, the prosecution was not under any obligation to include [it] in the Grand Jury notification." People v. Feliciano, 207 A.D.2d 803, 804,

616 N.Y.S.2d 529, 530 (1994); accord People v. Miranda, 11 Misc.3d 241, 243-44, 812 N.Y.S.2d 250, 252 (N.Y. Sup. Ct. 2005). Accordingly, the failure to notify Petitioner of this charge prior to submitting it to the grand jury was not a violation of New York law.

"More fundamentally, however, there is no federal constitutional right to indictment by a grand jury in state prosecutions." Pitts v. People, No. 00 Civ. 5505 (GEL), 2001 WL 410077, at *1 (S.D.N.Y. Apr. 23, 2001) (citing Hurtado v. California, 110 U.S. 516, 4 S. Ct. 292 (1884)). Therefore, any alleged errors, under New York law, in the state grand jury proceedings, are not cognizable on federal habeas corpus review. See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989).

Petitioner further contends that his second motion to dismiss should have been granted, pursuant to CPL § 30.10, as he was charged with third-degree burglary beyond the five-year statute of limitations applicable to the offense. However, as discussed above, the burglary charge was not time-barred, as Petitioner was charged with a burglary that occurred in 2003, not in 1998. See Part II, supra.

Accordingly, Petitioner's claims regarding the denials of his motions to dismiss were properly summarily rejected by the Appellate Division. See Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d

18

at 1 (holding these claims to be "unavailing"). More importantly, the Appellate Division's rejection of these state law claims, was not contrary to, or an unreasonable application of, federal law. The Court therefore recommends that the claims be dismissed.

IV. The Defective Felony Complaint

Petitioner contends that the felony complaint was defective because it did not provide probable cause to believe that he committed the crime of burglary, thereby depriving him of due process, and the court of jurisdiction. (Pet. St., at 19; Pet. Mem., at 32.) Petitioner points to the fact that the complaint mistakenly used the term "informant" instead of "defendant" in two instances, and argues that, as a result, reversal and dismissal of the indictment and the case in its entirety was mandatory. (Id.)

New York's Criminal Procedure Law § 100.40 provides that a felony complaint is sufficient on its face when the factual allegations provide reasonable cause to believe that the defendant committed the offense charged in the accusatory portion of the complaint. See N.Y. Crim. Proc. L. § 100.40(4)(b) (McKinney 2007).

Here, although the felony complaint mistakenly used the term "informant" rather than "defendant" in two instances, the hearing court noted in its decision and order that the "undoubtedly [] typographical error" in this case does not warrant dismissal or reversal. (See Exhibit D to Respondent's Declaration in Opposition

to Petition for a Writ of Habeas Corpus, dated Jan. 31, 2007, at 1-2.) There can be little question that Petitioner was aware that he, and not Bensalem, had been accused in the complaint; that is, there existed probable cause to believe that Petitioner, and not the "informant," committed the offense charged.

In any event, a scrivener's error in a criminal complaint does not give rise to a constitutional violation. Assuming, arguendo, that the felony complaint was defective, Petitioner was prosecuted pursuant to a legally sound grand jury indictment. The grand jury indictment, based upon a finding of probable cause to believe that Petitioner committed the charged offenses, supercedes any defect in the criminal complaint. See Gerstein v. Pugh, 420 U.S. 103, 108, 95 S. Ct. 854, 861 (1975) (where a criminal complaint does not establish probable cause, the prosecution reserves the right to charge the defendant with the same offense by indictment); Brown v. Perlman, 03 Civ. 2670 (RJH) (HBP) 2006 WL 2819654, *6 (S.D.N.Y. Sept. 29 2006) (Report and Recommendation adopted os Sept. 29, 2006) ("grand jury indictment superceded any prior accusatory actions, rendering any alleged pre-indictment deficiencies irrelevant"); Gonzalez v. Herbert, No. 91 Civ. 1709 (CSH), 1994 WL 259828, at *1 n.1 (S.D.N.Y. June 7, 1994) (jurisdictional defects in an original criminal complaint are rendered moot by an effective grand jury indictment). Moreover, Petitioner's conviction by a jury

transforms any defect in either the complaint or indictment into harmless error, because the conviction established proof beyond a reasonable doubt of Petitioner's guilt. See United States v. Mechanik, 475 U.S. 66, 73, 106 S. Ct. 938, 943 (1986) (a petit jury's supervening guilty verdict renders any error connected with a charging decision in a grand jury proceeding harmless beyond a reasonable doubt); accord Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989). Thus, any error that may have existed in the felony complaint was rendered harmless and moot. See Riley, 865 F.2d at 32.

Accordingly, Petitioner's claim that the defective felony complaint violated his due process rights is meritless, and the Appellate Division's rejection of this claim was neither contrary to, nor based on, an unreasonable application of federal law. Therefore, the claim should be dismissed.

V. The Inadequate Pro Se Inquiry

Petitioner contends that the trial judge failed to conduct the requisite inquiry to apprise him of the dangers of self-representation, thereby depriving him of his rights to the assistance of counsel, a fair trial, and due process. (See Pet. St., at 9; Pet. Mem., at 13-20.)

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the

criminal process." <u>Iowa v. Tovar</u>, 541 U.S. 77, 87, 124 S. Ct. 1379, 1387 (2004). Furthermore, the "right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.' " <u>Farretta v. California</u>, 422 U.S. 806, 814, 95 S. Ct. 2525, 2530 (1975) (quoting <u>Adams v. United States ex rel. McCann</u>, 317 U.S. 269, 279, 63 S. Ct. 236, 241 (1942)); <u>accord Dallio v. Spitzer</u>, 343 F.3d 553, 560 (2d Cir. 2003). However, prior to permitting a criminal defendant to proceed <u>pro se</u>, a court must determine that any waiver of the right to counsel is knowing, voluntary, and intelligent. <u>See</u> <u>Tovar</u>, 541 U.S. at 88, 124 S. Ct. at 1387.

While there are no specific warnings that must be given to a defendant, <u>see</u> <u>id.</u>, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" <u>Faretta</u>, 422 U.S. at 835, 95 S. Ct. at 2541 (quoting <u>Adams</u>, 317 U.S. at 279, 63 S. Ct. at 242); <u>but see</u> <u>Dallio</u> 343 F.3d at 564 (holding that "neither <u>Faretta</u>'s holding nor its dictum clearly establishes that explicit warnings about the dangers and disadvantages of self-representation are a minimum constitutional prerequisite to every valid waiver of the right to counsel"). The law usually "considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully

22

understands the nature of the right and how it would likely apply _in general_ in the circumstances – even though the defendant may not know the _specific detailed_ consequences of invoking it." <u>Tovar</u>, 541 U.S. at 92, 124 S. Ct. at 1390 (quoting <u>United States v. Ruiz</u>, 536 U.S. 622, 629, 122 S. Ct. 2450 (2002)) (emphasis in original).

   A. <u>Pre-trial Inquiry</u>

   At the pre-trial hearing, the court conducted a searching inquiry to determine if Petitioner was waiving his right to be represented by counsel knowingly, voluntarily, and intelligently. (<u>See</u> PT Tr. Aug. 14, at 2.) Petitioner explicitly asserted his desire to represent himself, noting his familiarity with criminal procedure law, that he extensively researched the laws concerning the charges against him, and that he had represented himself on a number of previous occasions. (<u>See</u> <u>id.</u> at 4.) However, the court then elicited from Petitioner that he had been convicted in the proceedings in which he represented himself and that his right to self-representation had been taken away on one occasion for "disrupting the proceedings." (<u>Id.</u>) Stressing the importance of counsel, the court warned:

> [Y]ou may think that you understand sufficient law to represent yourself, but it may turn out in the course of this that you really don't . . . . You are giving up the right to have somebody who is experienced, who does understand intimately these rules, speak for you, address a jury for you, speak to the Court for you, make proper argument for you and to cast it all in terms of the law.

23

> You are waiving that [very precious] right by proceeding
> pro se. Do you understand that?

(Id. at 6.) Petitioner responded affirmatively. The court then verified that Petitioner had the opportunity to speak with his current attorney about the disadvantages of self-representation, and informed Petitioner that jurors in criminal cases often feel very uncomfortable when a defendant represents himself. (See id. at 6-9.) The court offered one last warning to Petitioner, stating that "[l]aw is not practiced by learning it . . . from what you may have seen on occasion in the courtroom . . . . You have to know the law as it is written." (Id. at 8-9.) Petitioner again expressed his desire to proceed pro se, citing CPL § 210.15(5),[9] and the court granted Petitioner's motion to proceed pro se, but directed Ms. Iyer to remain involved as Petitioner's legal advisor.

The extensive pre-trial colloquy between Petitioner and the court sufficiently apprised Petitioner of the nature of the right to counsel, its general advantages, and the likely consequences of proceeding pro se. Thus, the pre-trial court met the Tovar standard

---

[9] New York CPL § 210.15(5) (McKinney 2007) reads: "If the defendant desires to proceed without the aid of counsel, the court must permit him to do so if it is satisfied that he made such decision with knowledge of the significance thereof . . . . A defendant who proceeds at the arraignment without counsel does not waive his right to counsel, and the court must inform him that he continues to have such right as well as all the rights . . . necessary to effectuate it, and that he may exercise such rights at any stage of the action."

of knowledge, voluntariness, and intelligence. <u>Cf.</u> <u>United States v.</u>
<u>Maldonado-Rivera</u>, 922 F.2d 934, 977 (2d Cir. 1990) (finding <u>Faretta</u>
inquiry adequate); <u>Torres v. United States</u>, 140 F.3d 392, 401 (2d
Cir. 1998) (same).

B. <u>The Pro Se Inquiry at Trial</u>

Prior to commencement of trial, the court acknowledged that
Petitioner wished to proceed <u>pro</u> <u>se</u> and advised him that he would
be held to the same standards as any attorney. (Transcript of Pre-
Trial "Mapp/Huntley Hearing," dated Oct. 28, 2003, at 4-5.)
Petitioner expressed no change of heart about his decision to
proceed <u>pro</u> <u>se</u>.

Petitioner now asserts, again citing New York CPL § 210.15(5),
that the trial court should have reiterated the inquiry conducted
by the hearing court prior to the commencement of trial, and
advised him of the "technical aspects of the law" that would arise
throughout the course of the trial. (Pet. Mem., at 16.) This claim
is unfounded, for it is not necessary to inform Petitioner of "the
<u>specific</u> <u>detailed</u> consequences of invoking" the right of self-
representation. <u>Tovar</u>, 541 U.S. at 92, 124 S. Ct. at 1390.
Nevertheless, at the pretrial hearing where the inquiry on <u>pro</u> <u>se</u>
representation was made, Petitioner was told of many of the
potential pitfalls he might face if he represented himself. (<u>See</u> PT
Tr. Aug. 14, at 6.) Nothing in the record suggests that Petitioner

25

did not know that he could limit his self-representation to pre-trial proceedings, or that he wished to do so, as he acknowledged the disadvantages of not being represented by counsel before a jury during the colloquy with the hearing court, and he acknowledged that his attorney at the time (who was appointed as advisory counsel and appeared at every subsequent proceeding) also discussed self-representation with him "at length". (See id. at 7.)

Petitioner explicitly invoked his right to self-representation, and the court's inquiry established that he understood the dangers and disadvantages of proceeding pro se and the value of legal representation. See People v. Davis, 32 A.D.3d 803, 804, 821 N.Y.S.2d 208, 208 (1st Dep't 2006). There is no clearly established constitutional right to be reinstructed on the dangers of self-representation at every stage of the criminal proceeding. See Dallio, 343 F.3d at 555 (providing a defendant with warnings of the disadvantages of self-representation is not "a constitutionally mandated prerequisite to every knowing and intelligent waiver of the right"); cf. Williams v. Bartlett, 44 F.3d 95, 100-101 (2d Cir. 1994) (holding that after an unequivical waiver of the right to counsel, a defendant may subsequently indicate a desire for representation by counsel by his conduct, but subsequent waiver of the right of self-representation requires further action or statements by the defendant before a trial court

needs to consider appointment of counsel).

Accordingly, the Appellate Division's conclusion that "[i]n light of the adequate pro se inquiry during pretrial proceedings . . . it is clear that defendant knowingly, competently and voluntarily waived his right to counsel, and further detailed inquiry by the trial court was not required," Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d 1, was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to habeas relief on the basis of this claim.

## VI. Limiting Petitioner's Cross-Examination

Petitioner argues that the trial court improperly limited his cross-examination of Fatah Bensalem regarding the Loss Prevention Incident Report ("L.P.I.R."), in violation the Confrontation Clause of the Sixth Amendment. (Pet. St., at 1-8; Pet. Mem., at 1-13, 30.)

The primary purpose of the Confrontation Clause is to secure for defendants the opportunity of cross-examination, see Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110 (1974), as this opportunity "is critical for ensuring the integrity of the fact-finding process." Kentucky v. Stincer, 482 U.S. 730, 736, 107 S. Ct. 2658, 2662 (1987). A violation of the Confrontation Clause exists when a criminal defendant is "prohibited from engaging in otherwise appropriate cross-examination designed . . . 'to expose

to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S. Ct. 1431, 1436 (1986) (quoting Davis, 415 U.S. at 318, 94 S. Ct. at 1111).

However, a criminal defendant's right to present evidence may be restricted so long as the restrictions serve "'legitimate interests in the criminal trial process,' . . . and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d 27, 30 (2d. Cir. 1992) (quoting Rock v. Arkansas, 483 U.S. 44, 55, 107 S. Ct. 2704, 2711 (1987)); accord Agard v. Portuondo, 117 F.3d 696, 702 (2d Cir. 1997). Indeed, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 547 U.S. 319, 326, 126 S. Ct. 1727, 1732 (2006); see also Fed. R. Evid. 403.

Federal habeas courts are traditionally reluctant to overturn state court evidentiary rulings. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) (the "Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues") (quoting

Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L.Ed.2d 674 (1986)). This rule applies in the context of limitations on cross-examination. See, e.g., Fuller v. Gorcyzk, 273 F.3d 212, 219-20 (2001) (denying habeas relief based on an alleged violation of the Confrontation Clause and finding the right to cross-examine is not absolute); cf. Maldonado-Rivera, 922 F.2d at 956 ("The decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused.").

Furthermore, a Confrontation Clause error does not per se require reversal of an otherwise valid conviction. See Fuller, 273 F.3d at 220. "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht [v. Abramhamson], 507 U.S. 619, 113 S. Ct. 1710 [1993], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt standard set forth in Chapman [v. California], 386 U.S. 18, 87 S.Ct. 824 [1967].'" Fry v. Pliler, -- U.S. --, 127 S. Ct. 2321, 2328 (2007). Under this standard, "an error is harmless unless it 'had substantial or injurious effect or influence in determining the jury's verdict.'" Id. at 2325 (quoting Brecht, 507 U.S. at 631). Put another way, a

29

habeas petitioner is "not entitled to habeas relief based on trial error unless he can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637 (quoting United States v. Lane, 474 U.S. 438, 449, 106 S. Ct. 725, 732 (1986)).

Thus, the judicially imposed limitations on cross-examination in Petitioner's case, even if in violation of the Confrontation Clause, are subject to a determination as to whether they had a substantial or injurious effect on the jury's verdict, before the alleged errors would entitle Petitioner to habeas relief.

## A. The L.P.I.R. Did Not Fall Within Business Records Hearsay Exception

Petitioner sought to introduce the L.P.I.R. under the business records hearsay exception of Civil Practice Law & Rules ("CPLR") § 4518,[10] in order to impeach the credibility of security guard Fatah Bensalem on the basis of alleged inconsistencies in his testimony. (See Tr. B at 86-87, 96, 100-04, 107-110.)

Section 4518 provides that any business record made as a memorandum of an event shall be admissible in evidence as proof of that event if the court finds that three foundational elements are satisfied: (1) that it was made in the regular course of business;

_____

[10] CPLR § 4518, is applicable to criminal cases pursuant to CPL § 60.10, providing that "[u]nless otherwise provided by statute or by judicially established rules of evidence applicable to criminal cases, the rules of evidence applicable to civil cases are, where appropriate, also applicable to criminal proceedings."

(2) that it was the regular course of business to make such records; and (3) the record was made at the time of the event or within a reasonable time thereafter. See N.Y. C.P.L.R. § 4518 (McKinney 2007).

Petitioner failed to lay the proper foundation for the admission of the L.P.I.R. into evidence under this hearsay exception. As for the first two factors that must be established, the document was a memorandum or record made in the regular course of business, and it was the regular course of business to make such records. Bensalem testified that L.P.I.R. reports are "internal document[s] for Eddie Bauer" that he compiled regularly as an Eddie Bauer employee. (See Tr. B at 96, 105-06.) Although he further testified that they were completed for his own recollection, it is clear that such reports were prepared in all instances of internal (employee) and external (shoplifter) theft. (See id. at 96, 105-06.) Thus, even if Eddie Bauer did not require that L.P.I.R.'s be prepared, they were undoubtedly regularly made in the course of business.

However, the contemporaneity requirement of the hearsay exception was not met, as Petitioner failed to establish that the report was compiled at the time of the event or within a reasonable time thereafter. Bensalem testified that he did not recall when he wrote the L.P.I.R., and they are sometimes filled out days after an

incident and sometimes months later. (See id. at 98.) He further implied that there was nothing in the document that would indicate to him when it was prepared. (See id.) Thus, the court was unable to determine whether the report was made "while the memory of the event was still fresh enough to be fairly reliable." Toll v. State, 32 A.D.2d 47, 50, 299 N.Y.S.2d 589, 592 (3rd Dep't 1969).

The court, therefore, properly exercised its discretion in determining that Petitioner failed to lay the necessary foundation to admit the L.P.I.R. into evidence under the business records hearsay exception. See, e.g., Matter of Gregory M., 184 A.D.2d 252, 585 N.Y.S.2d 193 (1st Dep't 1992) (ballistics report held inadmissible under § 4518(a) because it was undated and there was nothing to indicate that entries were either contemporaneous with the event or made within reasonable time thereafter).

B. Limitations on Cross-Examination for Impeachment Purposes

Petitioner cites various New York cases and statutes in support of his assertion that the failure to admit the L.P.I.R. into evidence improperly denied him the right to attack Bensalem's credibility. See Pet. Mem., at 1-3; see also N.Y. C.P.L.R. § 4514 ("any party may introduce proof that any witness has made a prior statement inconsistent with his testimony if the statement was made in a writing subscribed by him"); People v. Duncan, 46 N.Y.2d 74, 80, 412 N.Y.S.2d 833, 837 (1978); People v. Reger, 13 A.D.2d 63,

213 N.Y.S.2d 298 (1st Dep't 1961) (although "[t]he writing or document which revives a present recollection is not evidence . . . [o]pposing counsel . . . have a right to use it to test the credibility of the witness").

During direct examination of Bensalem, the prosecution used the L.P.I.R. written by Bensalem to refresh his memory as to the value of the shirts Petitioner had been charged with stealing. (See Tr. B at 56.) Petitioner then sought to use the document on cross-examination to demonstrate alleged inconsistencies between Bensalem's testimony and information in the L.P.I.R.. (See id. at 83-87.)

"As a general rule, the credibility of any witness can be attacked by showing an inconsistency between his testimony at trial and what he has said on previous occasions." Duncan, 46 N.Y.2d at 80, 412 N.Y.S.2d at 837. Furthermore, when a writing or a document is used to refresh the memory of a witness, the opposing party has a right to use that writing or document to test the credibility of that witness. See Reger, 13 A.D.2d at 70-71, 213 N.Y.S.2d at 307. This right extends to even those documents that would not be admissible as evidence, provided the document is used only for the purpose of impeachment. See People v. Hults, 76 N.Y.2d 190, 197-198, 557 N.Y.S.2d 270, 274 (1990) (noting that prior inconsistent statements, inadmissible as evidence-in-chief, is

nevertheless admissible on cross-examination to test the credibility of the witness). Thus, prior inconsistent statements of a witness may be used, so long as the questioning party has laid the proper foundation.[11]

In the instant case, the court permitted Petitioner to present the L.P.I.R. to Bensalem for recollection purposes, (see Tr. B at 96), and further reminded Petitioner that Bensalem was a live witness and could be asked about his previous actions and what had occurred. Petitioner then attempted to read from the report repeatedly, framing his statements as: "this is your description of the incident," (id. at 84); "in your loss prevention incident report, you state," (id. at 85); "in your report, you stated that. . . ." (Id. at 100). The prosecution's objections to this practice were sustained, as reading from the document was improper because it was not in evidence. See e.g., Reger, 13 A.D.2d at 70, 213 N.Y.S.2d at 307 (holding that playing tapes to the jury, when not admitted into evidence, solely for the purpose of impeachment, was error).

---

[11] To set the stage for the prior inconsistency, the questioner must first give the witness the opportunity to explain any apparent inconsistency between his testimony at trial and his previous statements, by eliciting from the witness the circumstances surrounding the making of the statement, and inquiring of him whether he in fact made it. See Duncan, 46 N.Y.2d at 80, 412 N.Y.S.2d at 837; People v. Wise, 46 N.Y.2d 321, 326, 413 N.Y.S.2d 334, 337 (1978).

In any event, Petitioner was able to cross-examine Bensalem about a number of minor inconsistencies between his report, grand jury testimony, and trial testimony. For example, Petitioner had the opportunity to elicit: (1) that Bensalem's trial testimony of how Petitioner carried the shirts to the fitting room differed slightly from his grand jury testimony, (see Tr. B at 81-82); (2) that Bensalem stated in his grand jury testimony that he viewed Petitioner removing the sensormatic tags from the shirts through "cracks of the door," but testified at trial that he viewed Petitioner through the space between the bottom of the door and the floor, (Tr. B at 88-90); (3) that he had written in the L.P.I.R. that Petitioner attempted to steal twelve shirts, but at trial testified it was only ten, (see Tr. B at 97-100); and (4) that Bensalem first mentioned that Petitioner struggled with him in his grand jury testimony, (see Tr. B at 107-08). The remaining alleged inconsistencies enumerated by Petitioner were either exceedingly minor or were not inconsistent with previous statements at all, but simply contained more detail. (see Pet. St., at 2.)

Bensalem acknowledged writing the allegedly inconsistent details in the L.P.I.R. and stated that the information that he had provided to police and in his testimony was "what's accurate." (Tr. B at 81-82, 99-100.)

C. Confrontation Clause Violation

Assuming _arguendo_ that Petitioner had laid the proper foundation to admit the L.P.I.R. into evidence, or that he properly used the document to impeach Bensalem's credibility, the court's limitations on cross-examination did not amount to a denial of the constitutional right to confront witnesses.

An erroneous evidentiary ruling may qualify for habeas relief only if it "by itself so infected the entire trial that the resulting conviction violates due process." _McGuire_, 502 U.S. at 72, 112 S. Ct. at 582 (internal citation omitted). To prevail on such a claim, "a petitioner must demonstrate that the state court's evidentiary error 'deprived [him] of a fundamentally fair trial.'" _Velazquez v. Poole_, No. 04 Civ. 478 (ENV)(CLP), 2007 WL 3240550, at *21 (E.D.N.Y. Oct. 30, 2007) (quoting _Zarvela v. Artuz_, 364 F.3d 415, 418 (2d Cir. 2004) (per curiam), _cert. denied_, 543 U.S. 879, 125 S. Ct. 140 (2004)). "[T]he test for determining whether the ruling denied the defendant a fair trial is whether it would have created 'a reasonable doubt that did not otherwise exist.'" _Collins v. Scully_, 755 F.2d 16, 18 (2d Cir. 1985) (citing _United States v. Agurs_, 427 U.S. 97, 112, 96 S. Ct. 2392, 2401 (1976)). Consequently, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error. . . . Rather, the writ would issue only where petitioner can show that the error deprived [him] of a _fundamentally fair_ trial." _Taylor v. Curry_, 708 F.2d

886, 891 (2d Cir. 1983) (citing Chambers v. Mississippi, 410 U.S. 284, 302-03, 93 S. Ct. 1038, 1049 (1973))(emphasis in original).

In this case, even if the court erroneously limited Petitioner's cross-examination of Bensalem, any possible error in doing so was harmless. See Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438. First, the discrepancies between Bensalem's testimony at trial and his previous statements and writings were minor and not material to the issue of Petitioner's guilt. In addition, as discussed above, Petitioner was permitted to conduct an otherwise extensive cross-examination of Bensalem. While there were some limits placed on the cross-examination, Petitioner was clearly able to convey the relevant information within the report for the jury to consider. Finally, there was extremely strong evidence corroborating Bensalem's testimony on material points and strongly supporting the jury's verdict.

Because the trial court's rulings were proper, and if there were any error, it was harmless, the Appellate Division's summary rejection of this claim as "unavailing" was neither contrary to, nor based on an unreasonable application of clearly established Supreme Court law, and Petitioner's Confrontation Clause claim should be dismissed.

VII. Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct

37

through suborning perjury, and in her remarks on summation. (See Pet. St., at 9-15; Pet. Mem., at 20-27) The Appellate Division rejected these claims, holding: (1) that the effect of the comments made during summation, "if any, could not have been so substantial as to deny defendant his due process right to a fair trial"; and (2) that there is "no support for defendant's contention that the prosecutor suborned perjury." Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d at 1.

### A. Suborning Perjury

Petitioner maintains that the prosecution suborned perjury by allowing Bensalem to testify falsely at trial about facts relating to the store, burglaries, and Petitioner's arrest. Specifically, Petitioner points to the statements made by Bensalem regarding: (1) the claim that Petitioner "scop[ed]" the store during the interval between the 1998 and 2003 incidents, an allegation not mentioned in the felony complaint, Bensalem's grand jury testimony, or the enhanced bill of particulars; (2) the claim that Bensalem viewed Petitioner through the space under the door of the fitting room, which varied from the statement to the grand jury that he was observed Petitioner through a crack in the door; (3) the statement to the grand jury that Petitioner struggled with Bensalem as he was carried back to the store, an allegation not mentioned to police officers or contained in the felony complaint, and resulting in an

additional count of robbery in the third degree being charged in the indictment; and (4) the lack of detail contained in the L.P.I.R.. (See Pet. Mem., at 20-22.)

"A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) (citing United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993)). Furthermore, there is a "heightened opportunity for prejudice where the prosecutor, by action or inaction, is complicit [with] untruthful testimony." Jenkins v. Artuz, 294 F.3d 284, 295 (2d Cir. 2002). Therefore, a conviction obtained by a prosecutor's "knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976). However, a defendant must show that the prosecutor was in fact aware of the perjury. Monteleone, 257 F.3d at 219.

Simply because there were minor inconsistencies between Bensalem's trial testimony and earlier statements he made, does not establish that his testimony was perjurious; that is, that the testimony was inherently false. Petitioner has not demonstrated

39

otherwise. Petitioner has not offered any evidence even suggesting, no less demonstrating, that the prosecutor knowingly relied on testimony that was perjurious. Instead, he only makes the conclusory allegation that "Ms. Amster's compilation of the felony complaint, as well as her involvement with, and administration of, the case, from the very beginning" creates a "virtual certainty" that she knowingly and intentionally represented and utilized false testimony. (See Pet. Mem., at 22.) Finally, Petitioner fails to show that the allegedly false testimony could have affected the jury's judgment, in light of the strong evidence introduced at trial to prove his guilt.

Upon reviewing this claim, the Appellate Division found that there was "no support for [Petitioner's] contention that the prosecutor suborned perjury." Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d at 1. Petitioner has not presented any evidence that even suggests that the state court's determination was unreasonable. Accordingly, Petitioner's claim with respect to prosecutorial misconduct by suborning perjury should be dismissed.

B. The Prosecutor's Summation

Petitioner contends that the prosecutor's summation was improper, insofar as she misrepresented Bensalem's trial testimony and repeated Bensalem's challenged allegations, resulting in a denial of his due process right to a fair trial. (See Pet. St., at

40

15; Petitioner's Appellate Division Brief Seeking Reversal of Judgment, at 45.)

On summation, the prosecutor stated that between 1998 and 2003, Petitioner was "outside the store lurking, scoping [as] shoplifters do." (Tr. B at 257.) In addition, in recalling how Bensalem viewed Petitioner under the fitting room door, the prosecutor exaggeratedly stated that "Mr. Bensalem [went] up to the door, bent down and peeked his head and basically had his head in the dressing room." (Id. at 262-63.) Petitioner's objections to these statements were overruled. (See id. at 262.)

A criminal conviction "is not to be lightly overturned on the basis of a prosecutor's statements standing alone" in an otherwise fair proceeding, United States v. Young, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044 (1985), for "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 947 (1982). The appropriate standard of review for a state prisoner's habeas petition premised upon a claim of prosecutorial misconduct on summation is "the narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986). Accordingly, a habeas petitioner must show that the prosecutor has engaged in "egregious misconduct" amounting

to a deprivation of the petitioner's right to a fair trial. See Donnelly v. DeChristoforo, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873-74 (1974); Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003). This is a heavy burden, as "[i]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181, 106 S. Ct. at 2471. In order for prosecutorial misconduct on summation to reach the level of a federal constitutional violation, improper remarks must cause "substantial prejudice" by "so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002)(quoting Darden, 477 U.S. at 181, 106 S. Ct. at 2471).

To determine whether there was substantial prejudice, this Court must view the allegedly objectionable remarks in the context of the entire trial. See Greer v. Miller, 483 U.S. 756, 765-66, 107 S. Ct. 3102, 3109 (1987); United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004). Accordingly, there are three factors that must be considered in assessing the existence of substantial prejudice: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of the conviction absent the improper statements." United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981); accord United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004); United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002).

Moreover, the Second Circuit has "repeatedly held that final arguments of counsel may be vigorous and robust if based on evidence in the record." United States v. Smith, 778 F.2d 925, 929 (2d Cir. 1985); accord United States v. Myerson, 18 F.3d 153, 163 (2d Cir. 1994). A prosecutor "is not an automaton whose role on summation is limited to parroting facts already before the jury. He is an advocate who is expected to prosecute diligently and vigorously, albeit without appeal to prejudice or passion." United States v. Wilner, 523 F.2d 68, 74 (2d Cir. 1975).

In the present case, the impropriety in the prosecutor's remarks, alleged by Petitioner, was not severe. As to the first allegedly improper remark, Bensalem testified that he positioned himself in the fitting room across from the one in which Petitioner was in, and then bent over, at which point he was able to observe Petitioner from the waist down. (Tr. B at 43-44, 94-95). Consequently, the prosecutor's comment on summation, that Bensalem "bent down and peeked his head and basically had his head in the dressing room," even if somewhat exaggerated, was based on evidence in the record and insufficient to constitute misconduct. See Smith, 778 F.2d at 929.

Furthermore, that the prosecutor repeated Bensalem's disputed testimony - that Petitioner "scoped" the store out after the 1998 incident - was not misconduct, as it reflected evidence in the

record. Assessing the weight to be given to the testimony was a question of fact for the jury to decide. Accordingly, these two brief statements, neither of which was inappropriate, did not constitute "egregious" misconduct that so infected the entire trial in such a way as to prejudice Petitioner.

The next factor to be weighed in assessing the prejudicial nature of the comments is the measures adopted to cure the misconduct. Modica, 663 F.2d at 1181. Here, even if the challenged comments had been improper, the court provided curative instructions to the jury sufficient to prevent the jury from being misled in its deliberations. The jurors were reminded that they are "the sole judges of the facts presented to [them] during trial" and it is their "recollection of the testimony and [their] evaluation of the evidence" that controls. (Tr. B at 289-90). Absent evidence to the contrary, it is presumed that the jury followed these instructions. See Zafiro v. United States, 506 U.S. 534, 540-41, 113 S. Ct. 933, 939 (1993); United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002).

The final factor to be examined under the Modica test is the certainty of the defendant's conviction absent the improper statements. 663 F.2d at 1181. Here, the proof adduced at trial against Petitioner, including the testimony of Bensalem and the police officers, as well as the merchandise and screwdrivers

recovered from his person at the crime scene, was sufficiently strong that there is little doubt that the jury would have found Petitioner guilty even absent the challenged comments made by the prosecutor. See id. at 1182.

Because (1) the alleged misconduct on summation was neither egregious nor highly prejudicial, (2) the court instructed the jury not to regard counsels' argument as evidence, and (3) there was strong evidence to support Petitioner's conviction, this Court concludes that the prosecutor's statements in summation did not deprive Petitioner of his due process right to a fair trial. It follows that the Appellate Divisions' rejection of the claim was not an unreasonable application of federal law. The claim should therefore be dismissed.

VIII. Amendment of the Indictment

Petitioner argues that his due process right to a fair trial was violated because the prosecutor constructively amended the indictment by "presenting evidence at trial which varied significantly from that which was presented to the grand jury." (Pet. St., at 16-18; Pet. Mem., at 27-29.)

Petitioner bases this claim upon the fact that Bensalem testified before the grand jury that he viewed Petitioner through "cracks" in the fitting room door, but testified at trial that he viewed Petitioner through the space under the door. In addition,

Bensalem first mentioned that Petitioner "scoped" the store, between the 1998 and 2003 incidents, in his trial testimony. Petitioner alleges that this testimony constructively amended the indictment, resulting in a violation of CPL § 200.70(2) and due process.

An indictment serves three important purposes. First, an indictment "provid[es] the defendant with fair notice of the accusations against him, so that he will be able to prepare a defense." People v. Grega, 534 N.Y.S.2d 647, 650, 72 N.Y.2d 489, 495 (1988) (quoting People v. Iannone, 412 N.Y.S.2d 110, 113, 45 N.Y.2d 589, 594 (1978)). Second, it "prevents the prosecutor from usurping the powers of the Grand Jury by ensuring that the crime for which defendant is tried is the same crime for which he was indicted, 'rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence.'" Id. And finally, "an indictment prevents later retrials for the same offense in contravention of the constitutional prohibition against double jeopardy." Id. New York's Criminal Procedure Law § 200.70(2) reflects these concerns, stating that "[a]n indictment may not be amended in any respect which changes the theory or theories of the prosecution as reflected in the evidence before the grand jury which filed it." N.Y. Crim. Proc. L. § 200.70(2) (McKinney 2007).

As a preliminary matter, the Fifth Amendment's prohibition

46

against constructive amendments of indictments applies only to prosecutions in federal courts and "is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment." Branzburg v. Hayes, 408 U.S. 665, 688 n.25, 92 S. Ct. 2646, 2660 n.25 (1972); see also LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002). Thus, the constructive amendment of an indictment in violation of state law does not create a federally cognizable claim.

In any event, the slight factual variances in Bensalem's trial testimony from his grand jury testimony did not give rise to a constructive amendment of the indictment. The indictment alleged that Petitioner had committed the offense of burglary, and it set forth the elements of that offense - that he knowingly entered the store unlawfully with intent to commit a theft therein (pursuant to N.Y. Penal L. § 140.20). This was precisely what Bensalem described in his grand jury and trial testimony, see id., and Petitioner was, in fact, convicted of burglary. Thus, the indictment contained sufficient detail such that Petitioner received fair notice of the theory or theories upon which the People were proceeding. These theories were consistent with the evidence presented at trial.

In sum, because any alleged inconsistency in testimony by Bensalem did not alter the nature of the charges the grand jury lodged, there was no constructive amendment of the indictment and

this claim should be dismissed as meritless.

IX. <u>Improper Denial of Discovery</u>

Petitioner argues that his due process rights were violated because the pretrial and trial judges improperly denied his discovery requests for expert analysis of the 1998 criminal trespass agreement and the burglar's tools allegedly recovered from him in 2003. (<u>See</u> Pet. St., at 43-46). Essentially, Petitioner contends that he was denied the opportunity to present a complete defense in violation of the Sixth Amendment.

"There is no general constitutional right to discovery [of exculpatory evidence] in a criminal case. . . . " <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559, 97 S. Ct. 837, 846 (1977). Rather, the government must only disclose material <u>in its possession</u> that is favorable to an accused. <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1197 (1963). This duty includes evidence that may be used to impeach a government witness, <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972), but does not apply to evidence not in the government's possession or under its control. <u>See</u> <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. at 1196-97 (only evidence <u>suppressed</u> by the prosecution violates due process). Therefore, a <u>pro se</u> defendant does not have a constitutional right to have a trial court order expert witnesses to examine evidence for its potential, though speculative, exculpatory or impeachment value,

when such an assessment has not been completed by the prosecution. Cf. Rock, 483 U.S. at 55, 107 S. Ct. at 2711 (upholding reasonable limits on a criminal defendant's right to present relevant evidence); accord Michigan v. Lucas, 500 U.S. 145, 149, 111 S. Ct. 1743, 1746 (1991).

At the pre-trial hearing, Petitioner claimed that he did not recall whether or not he had signed the 1998 criminal trespass agreement, and requested expert analysis for a comparison to his own handwriting. (See Pre-Trial Tr. dated Oct. 9, 2003, at 4-7.) The court denied this motion because Petitioner had not denied that the signature on the trespass notice was his. (See id. at 7.) The judge ruled that he would not consider assigning a handwriting expert until Petitioner took the opportunity to inspect the document and stated that he did not sign it. (See id. at 7.) In the absence of a denial by Petitioner that it was his signature, it was entirely reasonable for the judge to deny the request that such analysis be done.

Petitioner further requested fingerprint analysis in an attempt to show that his fingerprints were not on the burglar's tools that Bensalem testified he seized from Petitioner during the 2003 incident. (See id. at 7-10.) The court denied this motion as well. (See id. at 7.) The court noted that if fingerprint analysis was at all relevant, it was the government's burden to prove that

Petitioner's fingerprints were on the tools, not the Petitioner's burden to prove that they were not. (See id. at 7-8.) As the prosecution did not attempt to prove that fact, assigning an expert to disprove the theory was viewed as wholly unnecessary. (See id. at 7-8.)

Since the pre-trial judge made explicit that he would entertain such motions again if the circumstances should arise as to make expert analysis relevant, his denials of these motions were proper and exhibited no abuse of discretion. Moreover, there is no reason to believe that a fingerprint or handwriting analysis would have resulted in evidence favorable to Petitioner, as there was little question that he signed the first trespass notice and that he was found with the burglar's tools. Thus, the denial of the expert discovery did not prevent Petitioner from presenting a meaningful defense. See Caldwell v. Mississippi 472 U.S. 320, 323 n.1, 105 S. Ct. 2633, 2637 n.1 (1985) ("Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision [to deny the defendant's request for an expert]." (citing Ake v. Oklahoma, 470 U.S. 68, 82-83, 105 S. Ct. 1087, 1096-1097 (1985)). Accordingly, this claim should be dismissed.

X. Ineffective Assistance of Arraignment Counsel

Petitioner argues that he was denied the effective assistance of counsel when Mr. Lawrence Linzer, his arraignment attorney, failed to argue that Petitioner's burglary charge was time-barred and that the felony complaint was insufficient. (See Pet. St., at 46-47; Pet. Mem., at 46-48.) The Appellate Division found this claim to be "unavailing" and without merit. Cusamano, 22 A.D.3d at 428, 805 N.Y.S.2d at 1.

In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); LanFranco v. Murray, 313 F.3d 112, 118 (2002). First, he must establish that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. Second, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., 466 U.S. at 694, 104 S. Ct. at 2068. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id., 466 U.S. at 700, 104 S. Ct. at 2071.

Arraignment counsel's failure to bring claims that have been

determined to be meritless[12] undoubtedly does not fall "below an objective standard of reasonableness." Id.; see also United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance" of counsel). In addition, it is clear that Petitioner cannot demonstrate that there is a "reasonable probability that, but for" counsel's failure to bring these meritless claims, "the result of [Petitioner's trial] would have been different." See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because Petitioner cannot satisfy even one of the requisite factors of the Supreme Court's test for ineffective assistance of counsel in Strickland, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, this Court recommends that Petitioner's ineffective assistance of counsel claim be dismissed.

XI. Judicial Bias

Petitioner alleges that both the pretrial and trial judges exhibited judicial bias against him in the rulings and comments made throughout the proceedings, thereby depriving him of due process. (See Pet. St., at 22-43; Pet. Mem., at 34-38, 39-43.)

Adverse judicial rulings alone are generally an insufficient

---

[12] See Part II supra (finding that the burglary charge was not time-barred); Part IV supra (finding the complaint and indictment to be legally sufficient).

basis for a claim of judicial bias. See Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994). In fact, judicial rulings and remarks at trial "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases do not support a claim of bias or partiality unless they reveal 'such a high degree of favoritism or antagonism as to make fair judgment impossible.' " Francolino v. Kuhlman, 365 F.3d 137, 143 (2d Cir. 2004) (quoting Liteky, 510 U.S. at 555, 114 S. Ct. at 1157 (1994)). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," do not establish bias or partiality sufficient to meet this standard of favoritism or antagonism. Liteky, 510 U.S. at 555-56, 114 S. Ct. at 1157.

Petitioner argues that the hearing judge "engaged in several acts, rulings, and addresses which revealed apparent antipathy" toward him. (See Pet. St., at 39.) He alleges that various pre-trial motions were improperly denied and that he was addressed in a "demeaning and belittling nature." (Id.) However, as Petitioner often interrupted the court and "pressed [the judge] for actual rulings," (Pet. Mem., at 39), it would not be unreasonable for the judge to exhibit a limited degree of impatience. Liteky, 510 U.S. at 555-56, 114 S. Ct. at 1157. Regardless of Petitioner's

subjective assessment of the circumstances, the record clearly indicates that any impatience that may have been provoked was minor, and that Petitioner was in no way disfavored by the court.

With respect to trial, Petitioner argues that the judge improperly "engaged in, or rendered, a veritable laundry list of questionable acts and rulings," including: refusal to authorize requests for handwriting and fingerprint analysis; refusal to entertain Petitioner's statute of limitations motion; and preventing Petitioner from introducing the L.P.I.R. into evidence. (See Pet. Mem., at 34-36.) However, The Appellate Division and this Court have determined that these rulings were proper, thus, they cannot support a claim of bias or partiality.

In further support of Petitioner's claim of improper judicial conduct, he points to the fact that the trial court issued curative instructions to the jury to disregard Petitioner's mention of documents that were not in evidence, and directed Petitioner to restrict his closing argument to the facts presented at trial. (See id.) However, these instructions were entirely appropriate and necessitated by Petitioner's own actions.

Petitioner points to no conduct on the part of the judges that even suggests "such a high degree of favoritism or antagonism as to make fair judgment impossible." Francolino, 365 F.3d at 143. Petitioner cannot establish an identifiable bias and obtain a new

trial simply by gathering stray remarks unfavorable to the defense. See id. Accordingly, this claim is meritless and should be dismissed.

## XII. The "Multitudinous Errors"

Petitioner argues that the cumulative impact of the alleged errors committed by the lower courts, the prosecutor, and initially appointed defense counsel violated his right to fair proceedings. (See Pet. St., at 47-54; Pet. Mem., at 48-53.) Because the Appellate Division's conclusion that there were no such errors is entirely reasonable and consistent with clearly established federal law, this claim is meritless and should be dismissed.

CONCLUSION

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir.), cert. denied, 531 U.S. 873, 121 S. Ct. 175 (2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 82 S. Ct.

917 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Crotty. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 145, 106 S. Ct. 466, 470 (1985); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:      December 19, 2007
            New York, New York

Copies sent to:

Frederick H. Wen                    Anthony Cusamano
Assistant Attorney General          DIN 04R1255
of the State of New York            Ulster Correctional Facility
120 Broadway                        P.O. Box 800, Berme Road
New York, NY 10271                  Napanoch, New York 12458